## NYP Holdings, Inc. v Metropolitan Transp. Auth.

2025 NY Slip Op 31423(U)

April 22, 2025

Supreme Court, New York County

Docket Number: Index No. 157888/2023

Judge: Richard Tsai

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    **HON. RICHARD TSAI**                          PART                    21

                                          *Justice*

-----------------------------------------------------------------------------X

NYP HOLDINGS, INC. and NOLAN HICKS

                     Petitioners,

            - v -

METROPOLITAN TRANSPORTATION AUTHORITY,

                     Respondent.

-----------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 157888/2023 |
| MOTION DATE | 02/28/2024 |
| MOTION SEQ. NO. | 001 |

**DECISION + JUDGMENT ON PETITION**

The following e-filed documents, listed by NYSCEF document numbers (Motion 001) 1-25

were read on this petition for                  ARTICLE 78 (BODY OR OFFICER)                  .

In this Article 78 proceeding involving a request for records under the Freedom of Information Law (FOIL), petitioners NYP Holdings, Inc. and Nolan Hicks ask the court to compel respondent Metropolitan Transportation Authority (MTA) to produce crew books from Metro North Railroad (Metro North) and the Long Island Railroad (LIRR) and seeks attorneys' fees.   The MTA opposes the petition and invokes "the security exception," arguing that disclosure could "endanger the life or safety of any person" (Public Officers Law § 87 [2] [f]).

## BACKGROUND

Petitioner NYP Holdings, Inc. publishes the New York Post (Post), and petitioner Nolan Hicks is a Post reporter who writes about politics and city agencies, with a particular focus on transportation, among other subjects (*see* petition ¶¶ 4-5 [NYSCEF Doc. No. 1).  Hicks has published a series of articles regarding waste and mismanagement at the LIRR (*see* petition ¶ 5 n 1).

On February 15, 2023, Hicks submitted a FOIL Request on behalf of the Post through the MTA's online portal, for the crew books of the LIRR and Metro North for the years 2019 and 2023, to compare how the MTA assigns fare collectors to LIRR trains versus Metro North trains (petition ¶¶ 8-9; affirmation of Yohance Bowden ¶ 6 [NYSCEF Doc. No. 16]).

On February 23, 2023, the MTA contacted Hicks by e-mail, advising the Post that the agency denied the FOIL Request pursuant to Public Officers Law § 87(2)(f) on the purported grounds that, if disclosed, release of the crew books "could endanger the life and safety of any person" (*see* petitioner's Exhibit 3 [NYSCEF Doc. No. 4]).   The MTA stated, in relevant part, "These documents contain extensive security-sensitive information, the disclosure of which could be used to disrupt railroad operations or

157888/2023   NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION                           Page 1 of 6
AUTHORITY
Motion No.  001

[* 1]

damage railroad transportation infrastructure, threatening the lives and safety of railroad customers and passengers, and the general public" (*id.*).

The Post appealed the decision (*see* petitioner's Exhibit 4 [NYSCEF Doc. No. 5]).

On April 12, 2023, the Deputy General Counsel of the MTA denied the appeal, stating, in relevant part:

> "I have determined that the decision of the FOIL Officer to deny access to the Crew Books was and is correct. NYPOL §87(2)(f) permits the nondisclosure of information if it would pose a danger to the life or safety of any person. With respect to the Crew Books, the potential danger to LIRR and MNR personnel and the public is pronounced. These Crew Books contain detailed listings of crew assignments, including information on when crews are expected to report, when crews may leave trains at the end of their runs, where trains will be stored at the end of a run, and (by extension) when they will not have any LIRR and/or MNR personal [sic] aboard. Although crew assignments change periodically, as trains are added/abolished and new timetables adopted, much of the information contained in the Crew Books can remain valid from one edition to the next.
>
> In my opinion, disclosure of the information contained in the Crew Books could, among other things, enable third parties to potentially: (i) trespass at LIRR yards or terminals without being detected, exposing themselves and others to injury, (ii) illegally enter trains that are unoccupied by LIRR personnel, and/or (iii) after entering a train illegally, tamper with or disable train equipment, including safety equipment. This is exactly the type of situation which is dealt with NYPOL §87(2)(f)" (Petitioner's Exhibit 5 [NYSCEF Doc. No. 6]).

## DISCUSSION

"In an article 78 proceeding, judicial review of an agency's determination of a FOIL request is limited to whether it 'was affected by an error of law'" (*Matter of Jewish Press, Inc. v New York City Police Dept.*, 190 AD3d 490 [1st Dept 2021], quoting *Mulgrew v Board of Educ. of City School Dist. of City of N.Y.*, 87 AD3d 506, 507 [1st Dept 2011]).

As petitioners point out, FOIL

> "proceeds under the premise that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government. Thus, the statute affords the public the means to attain information concerning the day-to-day operations of State government. By permitting access to official information long shielded from public view, the act permits the electorate to have sufficient information in order to make intelligent, informed choices with respect to both the direction and scope

157888/2023   NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION AUTHORITY
Motion No.  001

Page 2 of 6

2 of 6

of governmental activities (see Public Officers Law, § 84). Moreover, judicious use of the provisions of the law can be a remarkably effective device in exposing waste, negligence and abuses on the part of government; in short, 'to hold the governors accountable to the governed' [citation omitted].

But while the Legislature established a general policy of disclosure by enacting the Freedom of Information Law, it nevertheless recognized a legitimate need on the part of government to keep some matters confidential. To be sure, the balance is presumptively struck in favor of disclosure, but in eight specific, narrowly constructed instances where the governmental agency convincingly demonstrates its need, disclosure will not be ordered" (*Matter of Fink v Lefkowitz*, 47 NY2d 567, 571 [1979]).

Thus, "[a]ll government records are presumptively open for public inspection unless specifically exempted from disclosure as provided in the Public Officers Law" (*Matter of Fappiano v New York City Police Dept.*, 95 NY2d 738, 746 [2001]).

"[T]he party seeking an exemption from disclosure has the burden of proving entitlement to the exemption" (*Mulgrew*, 87 AD3d at 507). "Exemptions are to be narrowly construed to provide maximum access, and the agency seeking to prevent disclosure carries the burden of demonstrating that the requested material falls squarely within a FOIL exemption by articulating a particularized and specific justification for denying access" (*Matter of Capital Newspapers Div. of Hearst Corp. v Burns*, 67 NY2d 562, 566 [1986]; *see also Matter of Fink*, 47 NY2d at 571). "Affidavits merely repeating the statutory phrasing of an exemption are insufficient to establish the requirement of particularity" (*Matter of DJL Rest. Corp. v Department of Bldgs. of City of N.Y.*, 273 AD2d 167, 168-196 [1st Dept 2000]). "[O]nce it is determined that the requested material falls within a FOIL exemption, no further [balancing of interests] or policy analysis is required" (*Matter of Abdur-Rashid v New York City Police Dept.*, 31 NY3d 217, 225 [2018], quoting *Matter of Hanig v State of N.Y. Dept. of Motor Vehs.*, 79 NY2d 106 [1992]).

Here, the MTA invoked Public Officers Law § 87 (2) (f), which is also known as the "public safety exemption" (*see e.g. Matter of Digital Forensics Unit v Records Access Officer*, 214 AD3d 532, 533 [1st Dept 2023]). Public Officers Law § 87 (2) (f) provides that an agency "may deny access to records or portions thereof that: . . . if disclosed could endanger the life or safety of any person."

According to Metro-North's Chief Security Officer, there were seven attempted or executed terrorist attacks upon New York City in the last 10 years, two of which appear to be connected to the subway system in New York City (*see* aff of Michael Metz ¶ 11 [NYSCEF Doc. No. 20]). According to the LIRR's Chief of Security, there was a terrorist plot in 2008 to bomb the LIRR inside of Penn Station during the Thanksgiving holiday, relying upon detailed information about the LIRR operations, communications and equipment and personnel (*see* aff of Robert Murphy ¶ 12 [NYSCEF Doc. No. 21]).

157888/2023   NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION          Page 3 of 6
AUTHORITY
Motion No.  001

3 of 6

[* 3]

The MTA contends that the records "could be used by terrorists and criminals to carry out an attack or commit other crimes more effectively" because the crew books "reflect[ ] the exact times and locations that train crewmembers will be boarding/deboarding; information reflecting when and where trains are stored and what their destinations will be; crewmember identities, employee identification numbers, internal contact information; and other sensitive information" (respondent's mem. at 2, 3 [NYSCEF Doc. No. 15]; aff of Joseph Lagana ¶¶ 8-10 [NYSCEF Doc. No. 18]; aff of Charles McKiernan ¶¶ 8-10 [NYSCEF Doc. No. 19]). The MTA analogizes the knowledge regarding the deployment or staffing levels of the fare collectors to staffing levels of law enforcement or military troops (respondent's mem. at 7; *see also* Lagan aff ¶ 15 [stating conductors and assistant conductors "serve an important safety and security role in that, as they walk the train assisting passengers and taking tickets, they look out for criminal activity, potential threats, and attack attempts on the train, among other suspicious activity"]; McKiernan aff ¶ 18 [same]).

The MTA argues that disclosure of the 2019 crew books would present the same risk, because "between each edition or revision the information in the crew books changes little, if at all; and where it does change, the proportions of staff boarding or deboarding trains at particular locations is generally the same" (respondent's mem. at 9); *see* McKiernan aff ¶ 15; *see* Metz aff ¶ 25). According to Metro-North's Chief Transportation Officer,

> "the relative proportions of crewmembers doing so at each time/location remain close to the same. Therefore, someone analyzing the information in a crew book would still be able to tell from a past year's edition of the crew book at which points in a particular train's route it would likely have the most or the least crew on board, and where the crew are most likely to be boarding or deboarding" (Lagana aff ¶ 13).

Petitioners argue that an agency may not invoke the Public Officers Law § 87 (2) (f) exemption on the basis of speculation, citing *Matter of Grabell v New York City Police Dept.* (47 Misc 3d 203 [Sup Ct, NY County 2014], *modified* 139 AD3d 477 [1st Dept 2016]) (*see* petitioner's reply mem. at 4). Petitioners maintain that the attacks in the last 10 years which the MTA cited "involved low-tech terrorist attacks informed only by a random assault on a perceived soft target"; that the information used was gleaned from readily available information from an internet search (petitioners' reply mem. at 6 n 1).

However, as the MTA correctly points out, "[t]he agency in question need only demonstrate 'a possibility of endanger[ment]' in order to invoke this exemption" (*Matter of Belamy v N.Y.C. Police Dept.*, 87 AD3d 874, 875 [1st Dept 2011] [citations omitted], *affd* 20 NY 3d 1028 [2013]; *see also Matter of Johnson v New York City Police Dept.*, 257 AD2d 343, 348-49 [1st Dept 1999] ["The determination of which disclosures represent a potential danger to witnesses should not necessarily depend on whether petitioner has articulated a threat against them"]). Although petitioners argue that the MTA did not supply any evidence to illustrate the likelihood of such danger to MTA

157888/2023 NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION AUTHORITY
Motion No. 001

Page 4 of 6

4 of 6

customers or personnel as a consequence of disclosure of the crew book (petitioners' mem. at 8), the "possibility of endangerment" test does not require a "likelihood" of endangerment.

In this court's view, there is a tension in the Court of Appeals cases which require "a particularized and specific justification for denying access" for exemptions generally (*see Matter of Capital Newspapers Div. of Hearst Corp.*, 67 NY2d 562, *supra*) with the line of appellate cases under *Matter of Belamy* (87 AD3d 874), which allow a "possibility of endangerment" to invoke the public safety exemption. Because the "possibility of endangerment" from the disclosure is based on conceptual risk (as opposed to any specific threat), the risk is unfortunately as broad as one's imagination as to what a terrorist or a criminal could find tactically useful, no matter how remote the risk might be. Petitioners essentially reject the notion that the "possibility of endangerment" here could ever suffice as a "particularized and specific justification" (*see* petitioners' reply mem. at 4-8).

*Matter of Grabell* (139 AD3d 477), which petitioners cite, is instructive.

There, the lower court compelled the New York City Police Department (NYPD) to provide copies of certain documents pertaining to the NYPD's purchase and use of a police vehicle known as a Z-backscatter van (*Matter of Grabell v New York City Police Dept.*, 47 Misc 3d at 204). The lower court ruled that the NYPD did not demonstrate that the public safety exemption applied because the court rejected as "mere speculation" the NYPD's argument that any records about the NYPD's prior use of the vans could circumvent their future effectiveness (*id.* at 211). The lower court did not discuss the appellate case law on the "possibility of endangerment."

On appeal, the Appellate Division, First Department modified the lower court's decision. The Appellate Division ruled that the materials were exempt from disclosure under FOIL's law enforcement and public safety exemptions, and that the NYPD had articulated a "particularized and specific justification for not disclosing" those records (*Grabell*, 139 AD3d at 478). The Appellate Division accepted the NYPD's explanation that "disclosing information about the locations in which NYPD has used the vans in the past, as well as the times and frequency of their deployment, would allow terrorists to infer when NYPD does not use them, and would permit a terrorist to conform his or her conduct accordingly," citing an appellate case applying the "possibility of endangerment" standard (*id.* at 479).

In this court's view, *Matter of Grabell* supports denial of the petition, as the MTA's explanation here is very similar to the explanation which the Appellate Division, First Department found sufficient to demonstrate the possibility of endangerment (*see also Matter of Digital Forensics Unit,* 214 AD3d at 533 ["disclosure of the rosters of all the NYPD precincts could permit individuals intent on causing harm to deduce which precincts have less resources and manpower, and tailor their conduct by targeting those areas"]). Although petitioners argue that a moving commuter train is not a police precinct, knowledge as to the number of personnel on a moving train is still useful,

157888/2023   NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION AUTHORITY
Motion No.  001

Page 5 of 6

5 of 6

tactical information for terrorists. Indeed, whereas the court in *Matter of Digital Forensics Unit*, surmised that "individuals intent on causing harm" might use precinct rosters to target areas where the respective precincts "have less resources and manpower" (214 AD3d at 533), it seems equally within the "possibility of endangerment" that someone intent on causing harm would use the subject information to target a train that has fewer conductors looking out for "potential threats, and attack attempts on the train" (Lagana aff ¶ 15).

Therefore, the MTA has demonstrated the records were exempt under the public safety exemption in Public Officers Law § 87 (2) (f). Although petitioners appear to seek the records to expose what they believe is waste or mismanagement at the LIRR, "if an agency establishes that the records sought fall within a FOIL exemption adopted by the legislature, the courts cannot order disclosure based on some other public policy concern asserted by a party or the court" (*Matter of Abdur-Rashid*, 31 NY3d at 238).

Finally, the petition alleges that the MTA did not explain "why production of redacted versions could not be made to avoid revealing the times when the trains might be unattended" (petition ¶ 18). Even assuming, for the sake of argument, that petitioners were not contending that the crew books were subject to mandatory redaction (*see* petitioners' reply mem. at 10 n 5), the MTA correctly points out that "[r]edactions to records sought under FOIL are available only under the personal privacy exemption" (*Matter of Judicial Watch, Inc. v City of New York*, 178 AD3d 540, 541 [1st Dept 2019]).

The court has considered petitioners' remaining arguments and finds them unavailing.

Therefore, the Article 78 petition to compel the MTA to produce the crew books of the LIRR and Metro North for the years 2019 and 2023 is denied. Because the petition is denied, the Post is not entitled to any attorneys' fees.

## CONCLUSION & JUDGMENT

It is hereby **ADJUDGED** that the petition is denied and the proceeding is dismissed.

20250422132552RTSAI500BC6E8DF9F4C7B9D5AEC1121F6CE8D

| **4/22/2025** | | | | | | **RICHARD TSAI, J.S.C.** | |
|---|---|---|---|---|---|---|---|
| **DATE** | | | | | | | |
| **CHECK ONE:** | X | CASE DISPOSED | | | | NON-FINAL DISPOSITION | |
| | | SETTLE ORDER | X | DENIED | | GRANTED IN PART | OTHER |
| **APPLICATION:** | | SETTLE ORDER | | | | SUBMIT ORDER | |
| **CHECK IF APPROPRIATE:** | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | REFERENCE |

157888/2023 NYP HOLDINGS, INC. ET AL vs. METROPOLITAN TRANSPORTATION          Page 6 of 6
AUTHORITY
Motion No. 001

6 of 6

[* 6]